NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0317n.06

No. 25-1782

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

LAURENCE WOLF, dba Laurence Wolf Properties, individually, and on behalf of a class of similarly situated persons and entities,

    Plaintiff-Appellant,

v.

CITY OF DETROIT, MICHIGAN, a municipal corporation,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jul 17, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: GRIFFIN, LARSEN, and READLER Circuit Judges.

GRIFFIN, Circuit Judge.

During the COVID-19 pandemic, Congress allocated billions of dollars for emergency rental assistance funding for states and localities, including the State of Michigan and the City of Detroit. Plaintiff Laurence Wolf sued the City, alleging that it unlawfully conditioned emergency rental assistance funding on compliance with its municipal code. The district court, however, held that Wolf lacked standing because he had applied only for funding controlled by the State, not the City, and the State's voluntary choice to apply the City's policies severed the causal chain between Wolf and the City. We agree and affirm.

I.

During the COVID-19 pandemic, Congress passed covid emergency rental assistance (CERA) legislation to stabilize the housing market, including the Consolidated Appropriations Act

of 2020 (CAA) and the American Rescue Plan Act of 2021 (ARPA). *See* 15 U.S.C. §§ 9058a, 9058c. The CERA legislation made emergency rental assistance funding available to state and local governments, called "grantees," for distribution to tenants and landlords alike. *Id.*

Under the CAA—the first legislative enactment—the federal government sent funds to the State of Michigan, which in turn administered its own CERA program through the Michigan State Housing Development Authority (MSHDA). Upon receipt of the federal funding, MSHDA disbursed funds through local Housing Assessment and Resource Agencies (HARAs), like the Wayne Metropolitan Community Action Agency (Wayne Metro), the Homeless Action Network of Detroit (HAND), and the United Community Housing Coalition (UCHC). Landlords would then submit CERA applications to HARAs for rental assistance through MSHDA's program. During this initial period, the City did not receive any CERA funding from the State of Michigan or from the federal government.

The second legislative enactment—ARPA—also provided additional emergency rental assistance. The City was a "direct recipient" of ARPA funding, and it used the same HARAs to distribute funds to landlords through its "ERAP program." The City did not receive any of these funds from or through the State.

The City used its ERAP program to enforce its municipal building code. As part of the application process, landlords needed to show that their properties were habitable, and they needed a "Certificate of Compliance," unless otherwise excepted. Relevant here, if a rental property was habitable but the landlord either lacked a Certificate of Compliance or an exception, 80% of potential rental payments would be awarded immediately and 20% would be placed into an escrow account (the 80/20 policy). For these applicants, the 20% held in escrow could be released later if

the landlord (1) obtained a Certificate of Compliance or an exception; or (2) completed repairs to the property in an amount equal to or greater than the escrowed amount.

Louis Piszker, testifying on behalf of one of the HARAs, Wayne Metro, explained that after the City implemented its ERAP program, Wayne Metro began administering the City's 80/20 policy for "all three programs." This meant that Wayne Metro enforced the City's 80/20 policy regardless of whether the funding came from MSHDA or the City. Piszker explained that although the City dictated the policy, "MSHDA had to agree to it also." Piszker further explained that the City "went to MSHDA, [and] MSHDA approved the 80-20 split; therefore, the 80-20 split would be administered consistently to all programs [operating within] the City of Detroit." Another HARA, UCHC, did the same, applying the City's 80/20 policy "to all CERA applications involving City of Detroit tenants." MSHDA was aware of this and did not prohibit UCHC from doing so.

As a Detroit landlord, Wolf applied for CERA relief solely through MSHDA's program, but he failed to obtain a Certificate of Compliance and did not meet the requirements for an exception. So 20% of the CERA funds he was eligible for were withheld.

Wolf sued the City under 42 U.S.C. § 1983 and brought claims under the Fifth and Fourteenth Amendments. Wolf moved for summary judgment, but the district court ordered supplemental briefing on standing before turning to the merits.

Based on the record evidence, the district court concluded that Wolf's injury was not traceable to the City because "the City didn't control the funds that Wolf received or applied for, MSHDA did." It added that the State's "independent and voluntary" decision to apply the City's 80/20 policy severed any traceable causal link to the City. Thus, the district court held that Wolf lacked standing. Wolf appealed.

II.

We review Article III standing de novo. *Generation Changers Church v. Church Mut. Ins. Co.*, 168 F.4th 354, 361 (6th Cir. 2026). Article III requires that a plaintiff establish (1) an "injury in fact," (2) "a causal connection between the injury and the conduct," and (3) that his claim is redressable. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At summary judgment, "mere allegations" in the pleadings are not enough. *Id.* at 561. Rather, a plaintiff's allegations must be supported by "affidavit or other evidence" to sustain his burden. *Id.*; Fed. R. Civ. P. 56(c)(1).

A.

Wolf first asserts that the district court committed procedural errors. He argues that the district court erred in crediting certain evidence, specifically Chelsea Neblett's declaration that the City merely asked MSHDA to apply its 80/20 policy to the State's funding. Although the district court raised the issue of standing sua sponte, the City, as the de facto movant, was required to show that there was no genuine dispute regarding Wolf's lack of standing. *See* Fed. R. Civ. P. 56(a), (c)(1). And Wolf had the burden to establish the opposite, namely that the City did more than merely ask MSHDA to enforce the 80/20 policy. *Id.* But Wolf failed to do so. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); *see also Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024). The district court did not err by crediting the declaration after Wolf failed to meaningfully dispute it.

Wolf also argues that the district court ignored other evidence and drew improper inferences against him as the nonmovant when it relied on Piszker's testimony. The district court said,

> That Wayne Metro had to apply the 80-20 requirement in each round of funding doesn't mean the City "dictated" it during each of those rounds. When it came to MSHDA funds—the funds Wolf received or applied for—it was the State's dictate, *not* the City's. And second, MSHDA's decision to apply the 80-20 requirement was a voluntary one, even if the City asked MSHDA to do so.

Wolf characterizes this reasoning as flawed because "MSHDA's agreement to allow the policy does not mean that MSHDA in fact implemented the 80-20 requirement, or that it required the HARAs to apply it to Detroit-based applicants—there is absolutely no evidence of MSHDA dictating or implementing the City's '80/20' Policy."

But Neblett's declaration establishes that the City asked MSHDA to apply its 80/20 policy, and that MSHDA voluntarily did so. Moreover, Piszker's testimony explained that "MSHDA approved the 80-20 split," meaning the HARA applied the 80/20 policy to funds requested by City landlords through MSHDA because the State independently approved of the practice. The district court did not draw any unreasonable or unfair inferences; it merely relied on the record. Thus, Wolf's procedural challenges fail.

B.

Wolf also asserts that the district court erred in its causation analysis. Causation requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation modified). In this regard, "[i]ndirect harms typically fail to meet this element." *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021). Unless a defendant's actions had a "determinative or coercive effect" upon the third party, the third party's independent actions will break the causal chain.

*Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see also Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 497 (6th Cir. 2023). We are reluctant to endorse "standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

The record shows that Wolf applied only for CERA funds controlled by MSHDA, not the City. So there is no direct causal link because the City never applied its 80/20 policy to Wolf. Still, Wolf argues that his injury is traceable to the City because the 80/20 policy was the cause of his harm, regardless of whether it was MSHDA that actually applied it to him. But for Wolf to succeed on an "indirect theory of traceability," he must show the City's actions had a "determinative or coercive effect" on the State. *Turaani*, 988 F.3d at 316 (citation omitted). Here, Wolf lacks that evidence. He points to no evidence showing that the State was compelled to adopt the City's 80/20 policy. And without some factual support on this point, "we are left only with the kind of attenuated causal chain that fails to meet Article III's requirements." *Id.* at 317.

Wolf's evidence is insufficient to create a genuine dispute regarding standing. First, emails from City officials and other City documents establish only that the City wanted the State to adopt its policies and that the State and City coordinated CERA relief in Detroit. At best, this evidence suggests that the City had an incentive to influence the State, but not that it could or indeed did "virtually determin[e]" the State's decision. *Bennett*, 520 U.S. at 170. Moreover, the State of Michigan is a sovereign, and the City is not. *See Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 566 (6th Cir. 2010). As a general matter, a city cannot force a state to do its bidding.

Wolf also points to emails from City officials that discuss a "funding swap" between the City's ERAP program and MSHDA's program. According to Wolf, these emails show that the

City could coerce the State because the entities shared commingled funds. The email chain shows that the City's program director emailed MSHDA after one of the HARAs asked to "convert [City] approved applications to [State] funds." The email chain concluded with an explanation that MSHDA approved the "conversion" and that the HARA had to "adjust the payments in the CERA portal (from ERAP2 to CERA1)." In short, this evidence shows simply that MSHDA allowed applications cleared for funding by the City to be paid by the State instead. And it shows that the City could only ask for the State's cooperation, not compel it.

We return to where we started: Wolf fails to establish that the City's wishes had a determinative or coercive effect on the State and therefore lacks standing. But Wolf digs in, asserting that even if the State independently adopted the 80/20 policy, this means only that he has standing against both the State and the City, not that he lacks standing against the City. But this is wrong—the State's "legitimate discretion breaks the chain of constitutional causation." *Turaani*, 988 F.3d at 317 (citation modified). And whether he might have standing against the State is irrelevant.

Finally, Wolf changes tack, insisting that the City actually coerced the HARAs to seize 20% of his CERA funds. Wolf relies on Piszker's testimony for this point. But Piszker's testimony establishes only that MSHDA adopted the City's policies, not that the City forced the HARAs to do so. And, even if it did, the State and City were the "grantees" under ARPA, so the State and City controlled their respective funds, not the HARAs.

In sum, Wolf fails to show his claims are fairly traceable to the City, and he therefore lacks standing. Because we resolve Wolf's standing on the causation element, we decline to address redressability.

III.

For these reasons, we affirm.